# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP1767-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin, Plaintiff-Respondent, v. Mitchell L. Christen, Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 391 Wis. 2d 650,943 N.W.2d 357
(2020 – unpublished)

| | |
|---|---|
| OPINION FILED: | May 4, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 21, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Nicholas McNamara |

JUSTICES:
ZIEGLER, C.J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, ROGGENSACK, DALLET, and KAROFSKY, JJ., joined. HAGEDORN, J., filed a concurring opinion. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion.
NOT PARTICIPATING:

ATTORNEYS:
For the defendant-appellant-petitioner, there were briefs filed by *Steven Roy*, Sun Prairie. There was an oral argument by *Steven Roy*.


For the plaintiff-respondent, there was a brief filed by *Nicholas S. DeSantis*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Nicholas S. DeSantis*.

2021 WI 39

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2019AP1767-CR
(L.C. No.  2018CM1998)

STATE OF WISCONSIN　　　　　　　　:　　　IN SUPREME COURT

**State of Wisconsin,**

　　　**Plaintiff-Respondent,**

　v.

**Mitchell L. Christen,**

　　　**Defendant-Appellant-Petitioner.**

**FILED**

**MAY 4, 2021**

Sheila T. Reiff
Clerk of Supreme Court

---

ZIEGLER, C.J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, ROGGENSACK, DALLET, and KAROFSKY, JJ., joined.  HAGEDORN, J., filed a concurring opinion.  REBECCA GRASSL BRADLEY, J., filed a dissenting opinion.

---

REVIEW of a decision of the Court of Appeals.  *Affirmed.*

¶1  ANNETTE KINGSLAND ZIEGLER, C.J.  This is a review of an unpublished decision of the court of appeals, State v. Christen, No. 2019AP1767-CR, unpublished slip op. (Wis. Ct. App. Mar. 17, 2020), affirming the Dane County circuit court's[1] judgment convicting Mitchell Christen of operating or going

---

[1] The Honorable Nicholas J. McNamara presided.

armed with a firearm while intoxicated, contrary to Wis. Stat. § 941.20(1)(b) (2017-18).[2]

¶2 Christen challenges his conviction arguing that Wis. Stat. § 941.20(1)(b) is unconstitutional as applied to him. He does not raise a facial challenge to the statute. Specifically, Christen claims that the statute violates his fundamental Second Amendment right to armed self-defense as held in District of Columbia v. Heller, 554 U.S. 570 (2008).[3] In Heller, the United States Supreme Court recognized that the core of the Second Amendment is the right to possess or carry a firearm for self-defense. Id. at 635.

¶3 However, as to Christen's as-applied challenge, we conclude Wis. Stat. § 941.20(1)(b) does not strike at the core right of the Second Amendment because he did not act in self-defense. Moreover, we conclude that § 941.20(1)(b) does not severely burden his Second Amendment right. Accordingly, we

---

[2] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

[3] We note that the United States Supreme Court in District of Columbia v. Heller, 554 U.S. 570 (2008), stated this right in a variety of ways: "the individual right to possess and carry weapons in case of confrontation," id. at 592; "an individual right to use arms for self-defense," id. at 603; and "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," id. at 635. Each of these formulations makes clear that the Second Amendment protects the right of an individual to possess and carry weapons for self-defense. See State v. Roundtree, 2021 WI 1, ¶35, 395 Wis. 2d 94, 952 N.W.2d 765 (identifying the core Second Amendment right detailed in Heller as "the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense").

apply intermediate scrutiny to Christen's as-applied challenge. Because § 941.20(1)(b) is substantially related to the important government objective of protecting public safety, it survives intermediate scrutiny as applied to Christen.

¶4 Accordingly, we conclude that Christen's as-applied challenge to Wis. Stat. § 941.20(1)(b) fails. Therefore, we affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶5 This case involves somewhat conflicting testimony about Christen arming himself in self-defense. Christen, his roommates, and his roommates' friends had been drinking alcohol on the evening of February 2, 2018. There was conflicting testimony about how much and to what extent there was arguing and pushing among them. However, the testimony was uncontroverted that Christen did arm himself. The jury was called upon to weigh and consider the evidence and determined that Christen went armed, was intoxicated, and did not act in self-defense.

¶6 The jury heard that Christen and his two roommates, B.H. and C.R., had a rocky relationship. This rocky relationship came to a head on the night that gave rise to this case, February 2, 2018. On that night, Christen and B.H. got in an argument, which C.R. and a friend, K.L, overheard. Prior to the argument, all of the men had been drinking alcohol. At the conclusion of the initial argument, Christen went back to his room, and C.R., B.H., and K.L. left to go to a bar. B.H.

3

testified that before they went to the bar that night Christen said "something aggressive" and had called C.R.'s mother a "piece of trash drunk."

¶7 Some point later in the night, C.R., B.H., and K.L. returned to the apartment. Another friend of the men, M.A., joined them after they returned. Christen opened the door for M.A. and said, "Here's the asshole roommates you were looking for . . . ."

¶8 The jury also heard that Christen, C.R., and M.A were in an argument. Christen had insulted C.R.'s mother, and M.A. intervened. Christen testified that M.A. pushed Christen with his chest up against Christen's doorframe. Christen testified that, as a response to M.A.'s intervention, he said, "[he] wasn't going to be a victim and [he] had a weapon and [he] wasn't afraid to use it." He testified that he then pointed to his handgun. He continued his testimony, stating, "I just turned and pointed that it was where I had kept it on my nightstand and I said I feel intimidated. I'm into my bedroom, which is small. I have nowhere else to go. I was presenting the weapon as a deterrent." Upon Christen pointing to the handgun, the argument ended, and Christen closed his bedroom door.

¶9 At some point, M.A. stopped in front of Christen's room, and they exchanged words. M.A. testified that he knew Christen was upset so he followed Christen to his room and said, "hey, just take it easy, have fun with us." M.A. stated that Christen responded by picking up his firearm and saying, "get

4

out of here or I will shoot you." M.A. testified that he shut the door and returned to the others. C.R. similarly testified that he watched M.A. stop in front of Christen's room and saw a "gun come up between [M.A.] and [Christen]." He confirmed that M.A. shut the door, returned to the others, and said "[your] fucking roommate just pulled a gun on me. What the fuck." Christen characterized the incident differently. He stated that after M.A. opened the door, he picked up his handgun, "held it sideways towards the wall away from [M.A.]," and told M.A. to leave, which M.A. did.

¶10 Christen began recording the situation on his cellphone after this second interaction with M.A. The jury viewed the video at trial; it began with Christen saying that "[i]f someone comes through this door [he] will shoot them." He further told M.A., who was standing in front of his door, that M.A. "should get the fuck out of here." In response, M.A. threatened to call 911. Christen stated that he didn't "give a fuck" and that M.A. needed to leave. M.A. responded, "Seriously. Be nice, be nice man, be nice." Christen can later be heard saying on the video the following:

> They're not listening; I've asked them to leave. I'm within my right. I said go away, get away from my house, away from my room. They should leave it would just be smart for them.

¶11 Not long after that, Christen said that he was going to the kitchen with his handgun because he did not "trust anybody in this house." Christen came out of his room in underwear displaying a handgun tucked in his waistband. The

5

video then becomes jostled. The testimony revealed that M.A. disarmed him, and Christen returned to his room. C.R. testified that he heard Christen cock his shotgun, which the video confirms. K.L. disassembled the handgun and placed the disassembled handgun in the cabinets.

¶12 After he returned to his room, Christen stopped the recording on his phone and called 911. The 911 recording was also played for the jury. Christen told the 911 operator that M.A. stole his handgun. He also stated that "[i]f someone comes through [his] door, they're getting a fucking face full of lead." Over the course of the nearly 20-minute 911 phone call, Christen denied threatening M.A. Further, when the 911 dispatcher asked Christen whether M.A. attacked him before he left with his handgun, Christen said "not physically."

¶13 The police arrived in response to Christen's 911 call. Christen's two roommates and their two friends exited the apartment and reported to the police that Christen was intoxicated and had threatened them with his firearms. Christen remained in the apartment for approximately 30 minutes before exiting the apartment unarmed. One of the officers who interacted with Christen after he exited the apartment testified that as he spoke to Christen he "observed an odor of intoxicants coming from [Christen's] breath and mouth [and] his eyes [were] glassy and bloodshot." Other members of law enforcement testified that Christen appeared "worked up" and "paranoid."

¶14 The police arrested Christen and brought him to the booking area of the jail. While in the booking area, Christen claimed he armed himself in self-defense.

¶15 On February 4, 2018, the circuit court found probable cause that Christen did commit a crime. Two days later, the State filed a criminal complaint in the circuit court charging Christen with three counts: Count 1, pointing a firearm at another, contrary to Wis. Stat. § 941.20(1)(c), a Class A Misdemeanor; Count 2, operating or going armed with a firearm while intoxicated, contrary to § 941.20(1)(b), a Class A Misdemeanor; and Count 3, disorderly conduct, contrary to Wis. Stat. § 947.01(1), a Class B Misdemeanor. Christen made his initial appearance the same day.

¶16 On March 21, 2018, Christen filed a motion to dismiss Count 2, operating or going armed with a firearm while intoxicated, arguing that it violated his Second Amendment right. The circuit court held a hearing on this motion to dismiss on July 13, 2018. The court concluded that Wis. Stat. § 941.20(1)(b), the statute that Christen challenged, "is focused narrowly enough to withstand [the] constitutional challenge that's been raised" and denied Christen's motion.

¶17 On October 17, 2018, Christen's jury trial began. During the trial, the jury heard testimony from Christen, the individuals in the apartment, and the officers who arrived on the scene. After both sides rested their arguments, the court instructed the jury.

7

¶18 As part of the jury instructions, the circuit court read a self-defense instruction on each count. The circuit court informed the jury that it could find Christen guilty of operating or going armed with a firearm while intoxicated only if it was "satisfied beyond a reasonable doubt that . . . [Christen] did not act lawfully in self-defense." The parties then made closing arguments, and the court submitted the case to the jury.

¶19 After deliberating, the jury returned a verdict of not guilty on Count 1, pointing a firearm at another, and guilty on Counts 2 and 3, operating or going armed with a firearm while intoxicated and disorderly conduct, respectively. Thus, the jury concluded affirmatively that the State proved beyond a reasonable doubt that Christen did not operate or go armed with a firearm nor engaged in disorderly conduct in self-defense. The following day, the circuit court sentenced Christen to four months in the Dane County jail for Count 2 and two months in the Dane County jail for Count 3, to run concurrently. The circuit court subsequently held the sentence in abeyance pending appeal.

¶20 On September 13, 2019, Christen appealed his conviction of operating or going armed with a firearm while intoxicated, arguing that Wis. Stat. § 941.20(1)(b) was unconstitutional as applied to him. The State did not file a response to this appeal.

8

¶21 The court of appeals[4] affirmed the judgment of conviction. Christen, No. 2019AP1767-CR, ¶1. The court of appeals determined that Christen failed to develop his as-applied challenge based on the facts of his particular case. Id., ¶7. The court of appeals held that this failure to apply the law to his particular facts was "so complete that [the court did] not need to address the standard of review or other points referenced in his brief" and affirmed Christen's judgment of conviction. Id.

¶22 On April 16, 2020, Christen petitioned this court for review; we granted his petition.

## II. STANDARD OF REVIEW

¶23 Christen asks us to review whether Wis. Stat. § 941.20(1)(b) is unconstitutional as applied to him. "Examining the constitutional application of a statute presents a question of law that this court reviews independently of the determinations rendered by the circuit court or court of appeals." State v. Roundtree, 2021 WI 1, ¶12, 395 Wis. 2d 94, 952 N.W.2d 765.

¶24 This case also requires us to determine the appropriate level of scrutiny to guide our analysis. "This issue likewise presents a question of law that we determine independently." Id., ¶13.

---

[4] Because Christen was appealing a misdemeanor conviction, one court of appeals judge, the Honorable Brian W. Blanchard, heard his appeal. See Wis. Stat. § 752.31(2)(f), (3).

III. ANALYSIS

¶25 The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[5] The right to keep and bear arms is an individual "core" right protected and is a "right of law abiding, responsible citizens to use arms in defense of hearth and home." Heller, 554 U.S. at 635. However, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." Id. at 626. Historically, "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. The Heller Court explained:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Id. at 626-27. The Court described these regulations and prohibitions as "presumptively lawful." Id. at 627 n.26. Two years after Heller, the Court held that the Second Amendment was

---

[5] Similarly, Article I, section 25 of the Wisconsin Constitution provides: "The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose." However, Christen exclusively focuses his arguments on the Second Amendment, so we will exclusively focus our analysis on the Second Amendment as well. See Roundtree, 394 Wis. 2d 94 (focusing exclusively on the Second Amendment in a similar challenge).

incorporated against the States. McDonald v. City of Chicago, 561 U.S. 742, 750 (2010). This means that the Second Amendment's protections "apply identically to the States and the Federal Government." Id. at 766 n.14.

¶26 Christen was convicted of possession of a firearm while intoxicated contrary to Wis. Stat. § 941.20(1)(b), which provides that a person who "[o]perates or goes armed with a firearm while he or she is under the influence of an intoxicant" "is guilty of a Class A misdemeanor."

¶27 Wisconsin Stat. § 941.20(1)(b) bars the use of a firearm when the individual is intoxicated. This statute does not completely dispossess a lawful firearm owner from ownership. It merely limits the circumstances under which the lawful firearm owner may use or carry the firearm, specifically while intoxicated. Further, a lawful firearm owner, even if intoxicated, cannot be convicted under § 941.20(1)(b) if he or she acts in self-defense.

¶28 Christen argues that Wis. Stat. § 941.20(1)(b) is unconstitutional as applied to him because it burdens his Second Amendment right to armed self-defense recognized in Heller. He frames the issue in terms of whether the consumption of a legal intoxicant voids the Second Amendment's guarantee of the right to carry a firearm in self-defense. He argues that his possession of his firearms is within the scope of the Second Amendment because he carried his firearms in his home for the purpose of self-defense. Specifically, Christen asserts that he was armed in response to an ongoing situation in which he was

11

afraid he may need to resort to self-defense, despite the jury's conclusion that he did not act in self-defense. He requests that this court ignore the two-step approach that has become the consensus framework for analyzing such Second Amendment challenges[6] and that this court applied in Roundtree. 394 Wis. 2d 94, ¶¶39-40.

¶29 While this two-step approach has been widely adopted, courts are divided on which level of scrutiny to apply if a law substantially burdens the core Second Amendment right.[7] Christen asserts that, if we continue to utilize the two-step approach, we should apply strict scrutiny to his case because the right to bear arms is fundamental and the statute burdens the core of the Second Amendment. He contends that Wis. Stat. § 941.20(1)(b) cannot survive strict scrutiny review and that, even if this court were to apply intermediate scrutiny, the law is still unconstitutional as applied to him.

_____

[6] See, e.g., Gould v. Morgan, 907 F.3d 659, 668 (1st Cir. 2018) (collecting cases that applied the two-step approach from the Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, and D.C. Circuits); GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs, 788 F.3d 1318, 1322 (11th Cir. 2015) (applying the two-step approach); see also State v. Weber, No. 2019-0544, 2020 WL 7635472, at ¶13 (Ohio Dec. 23, 2020) (same); People v. Burns, 79 N.E.3d 159, ¶38 (Ill. 2015) (same); Hertz v. Bennett, 751 S.E.2d 90, 93 (Ga. 2013) (same).

[7] Compare Mai v. United States, 952 F.3d 1106, 1115 (9th Cir. 2020) (applying strict scrutiny to "laws that both implicate a core Second Amendment right and place a substantial burden on that right" while applying intermediate scrutiny in any other context) cert. denied, No. 20-819, 2021 WL 1602649 (mem.) (U.S. Apr. 26, 2021), with Ezell v. City of Chicago, 651 F.3d 684, 708 (7th Cir. 2011) (applying intermediate scrutiny on a sliding scale).

¶30 We begin our analysis by discussing as-applied challenges generally. We then apply the established two-step approach to Second Amendment challenges that we set forth and applied in Roundtree, to Christen's challenge to Wis. Stat. § 941.20(1)(b).

### A. As-Applied Challenges Generally

¶31 As we have repeatedly stated, there is a distinction between a facial and as-applied challenge. See, e.g., Waupaca Cnty. v. K.E.K., 2021 WI 9, ¶¶14-15, 395 Wis. 2d 460, 954 N.W.2d 366. "Under a facial challenge, the challenger must show that the law cannot be enforced under any circumstances." Id., ¶14 (quoting Winnebago Cnty. v. C.S., 2020 WI 33, ¶14, 391 Wis. 2d 35, 940 N.W.2d 875).

¶32 "In contrast, in an as-applied challenge, we assess the merits of the challenge by considering the facts of the particular case in front of us 'not hypothetical facts in other situations.'" Id., ¶15 (quoting League of Women Voters of Wis. Educ. Network, Inc. v. Walker, 2014 WI 97, ¶13, 357 Wis. 2d 360, 851 N.W.2d 302). As we recently explained in Roundtree:

> For an as-applied challenge to succeed, the challenger must demonstrate that the challenger's constitutional rights were actually violated. If such a violation occurred, the operation of the law is void as to the facts presented for the party asserting the claim. We presume that the statute is constitutional, and the party raising a constitutional challenge must prove that the challenged statute has been applied in an unconstitutional manner beyond a reasonable doubt.

395 Wis. 2d 94, ¶18 (citations omitted).

### B. Wisconsin Stat. § 941.20(1)(b) Survives Christen's Challenge.

¶33 Christen argues in his as-applied challenge that Wis. Stat. § 941.20(1)(b) interfered with his fundamental right to bear firearms in self-defense, which the Second Amendment guarantees to him. Christen asserts that, despite his ingestion of alcoholic intoxicants, he was carrying his firearms for self-defense, ignoring that the jury concluded that he did not act in self-defense. As this is an as-applied challenge, he must demonstrate that under these facts, his constitutional rights were violated. He does not assert that the statute is unconstitutional in all applications.

¶34 As explained in Roundtree, "[g]enerally, Second Amendment challenges require this court to undertake a two-step approach." 395 Wis. 2d 94, ¶39. Under this two-step approach, "[w]e ask first 'whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.'" Id. (quoting State v. Herrmann, 2015 WI App 97, ¶9, 366 Wis. 2d 312, 873 N.W.2d 257). "If the answer is no, then the inquiry ends." Id. "If the first inquiry is answered in the affirmative, then the court proceeds to inquire into 'the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights.'" Id., ¶40 (quoting Herrmann, 366 Wis. 2d 312, ¶9). We conduct this second inquiry through a means-end analysis and application of a heightened level of scrutiny. See, e.g., id., ¶¶38, 41

14

(applying intermediate scrutiny to a challenge to a felon-in-possession law).

¶35 Christen raises a Second Amendment challenge arguing that we should apply a "categorical approach" despite the fact that we have adopted a two-step approach. See id., ¶¶26-40. We continue to reject a categorical approach and apply the same two-step approach we adopted in Roundtree.

### 1. Step one: Does Wis. Stat. § 941.20(1)(b) impose a burden on conduct falling within the Second Amendment's scope?

¶36 The first step in the inquiry is to consider "whether the regulated activity falls within the scope of the Second Amendment." Kanter v. Barr, 919 F.3d 437, 441 (7th Cir. 2019) (quoted source omitted). "This is a textual and historical inquiry; if the government can establish that the challenged law regulates activity falling outside the scope of the right as originally understood, then 'the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.'" Id. (quoted source omitted). Thus, we must determine whether the regulated activity here, operating or going armed while intoxicated, falls outside the scope of the Second Amendment as historically understood. If it does fall outside the scope, the inquiry ends, and the challenged statute does not conflict with the Second Amendment.

¶37 We recognize that Wisconsin has a long tradition of criminalizing the use and carrying of a firearm while intoxicated. § 3, ch. 329, Laws of 1883. A similar tradition

15

of laws regulating firearms and alcohol also existed in some form at the time of the founding. See State v. Weber, No. 2019-0544, 2020 WL 7635472, at ¶103 (Ohio Dec. 23, 2020) (DeWine, J., concurring in judgment) (collecting colonial statutes that criminalize the use of a firearm while intoxicated). Such statutes continued to proliferate and expand throughout the United States during the 19th and 20th centuries. See id., at ¶20 (collecting statutes criminalizing the use or carrying of a firearm while intoxicated enacted during the 19th and 20th centuries).

¶38 While these statutes provide a relevant, perhaps even persuasive backdrop that shows a long history of criminalizing the use and carrying of firearms while intoxicated, it is debatable whether these statutes show that the use and carrying of firearms in such circumstances is categorically unprotected. Compare People v. Deroche, 829 N.W.2d 891, 896 (Mich. Ct. App. 2013) (concluding that the historical evidence demonstrates that the use and carrying of a firearm while intoxicated was within the scope of the Second Amendment) and Dissent, infra (same) with Weber, 2020 WL 7635472, at ¶108 (DeWine, J., concurring in judgment) (concluding that the historical evidence demonstrates that the use and carrying of a firearm while intoxicated was outside the scope of the Second Amendment) and Concurrence, infra (same).

¶39 However, we need not resolve this case on step one because, as we explain below, Christen's challenge fails under step two. As such, we assume, without deciding, that Wis. Stat.

16

§ 941.20(1)(b) regulates conduct that falls within the scope of the Second Amendment.[8]  See Weber, 2020 WL 7635472, at ¶22 (assuming step one is answered affirmatively and collecting cases where the court assumed arguendo step one).

### 2. Step two:  Is Wis. Stat. § 941.20(1)(b) unconstitutional as applied to Christen based on the appropriate means-end analysis?

¶40  In considering step two, Heller dictates that we apply some form of heightened scrutiny, Heller, 554 U.S. at 628 n.27, so we first must determine what level of heightened scrutiny to apply to Christen's challenge.  We then must apply that level of scrutiny.

### a.  Level of scrutiny

¶41  Christen and the State disagree as to the level of scrutiny that we should employ in this case.  It is clear that we cannot use the rational basis level of scrutiny to review statutes that are alleged to burden core Second Amendment rights.  Id. ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").  So, we must determine whether intermediate or strict scrutiny applies to Christen's as-applied challenge.

¶42  In Roundtree, we adopted the Seventh Circuit's approach from Ezell v. City of Chicago, 651 F.3d 684 (7th Cir.

_____

[8] We leave further analysis of step one for another case. No inferences should be drawn from our assumption and preference to decide these issues based upon our analysis in step two.

17

2011), which indicates that "the rigor of . . . judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." Roundtree, 395 Wis. 2d 94, ¶¶26, 34 (quoting Ezell, 651 F.3d at 703). "[T]he core right identified in Heller is 'the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense . . . .'" Id., ¶35 (quoting United States v. Chester, 628 F.3d 673, 683 (4th Cir. 2010)). Because Christen's as-applied challenge argues that Wis. Stat. § 941.20(1)(b) burdens this core right that Heller identified, we do not need to conclusively determine the entire scope of the Second Amendment to resolve this case. See id., ¶36; Serv. Emp. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶24, 393 Wis. 2d 38, 946 N.W.2d 35 ("We do not step out of our neutral role to develop or construct arguments for parties; it is up to them to make their case."). Accordingly, this case requires us to determine how close § 941.20(1)(b) comes to Christen's right to possess and carry a weapon for self-defense and the severity of the burden § 941.20(1)(b) imposes on that right.

i. Wisconsin Stat. § 941.20(1)(b) does not strike at the core of the Second Amendment.

¶43 Christen argues that Wis. Stat. § 941.20(1)(b) strikes at the core of the Second Amendment. He asserts that he has a core fundamental Second Amendment right to possess and bear his firearms in anticipation of the need for self-defense, whether intoxicated or not, so as to necessitate the highest tier of scrutiny——strict scrutiny. While he does have the right to

18

"possess and carry weapons in case of confrontation," "the right secured by the Second Amendment is not unlimited." Heller, 554 U.S. at 592, 626. As such, we must consider how close to the Second Amendment core right that § 941.20(1)(b) strikes.

¶44 Although at trial Christen successfully raised[9] the issue of self-defense, the jury found beyond a reasonable doubt that Christen did not act in self-defense. Wisconsin has codified the privilege of self-defense. § 939.48(1) ("A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person."). This self-defense privilege extends further in the context of the home where the privilege may include the presumptive right to use deadly force. See § 939.48(1m)(ar). When a defendant successfully raises the self-defense privilege, the State has the burden to disprove self-defense beyond a reasonable doubt at trial. State v. Head, 2002 WI 99, ¶106, 255 Wis. 2d 194, 648 N.W.2d 413. If the State cannot prove beyond a reasonable doubt at trial that the defendant did not act in self-defense, then the self-defense privilege serves as "a defense to prosecution for any crime based on that conduct." § 939.45.

---

[9] "'Successfully' putting self-defense at issue means the defendant has satisfied the burden of production." State v. Austin, 2013 WI App 96, ¶12 n.5, 349 Wis. 2d 744, 836 N.W.2d 833.

19

¶45 Throughout his brief, Christen continually asserts that he went armed for self-defense. However, the jury was instructed on self-defense and concluded that Christen did not act in self-defense. As Christen raises an as-applied challenge, his challenge must rest upon these facts. The jury heard competing testimony and witnesses and was instructed to consider whether Christen was armed in self-defense. Given that the jury concluded that Christen did not act in self-defense, it would be irreconcilable to conclude that his right to self-defense was somehow infringed. See Head, 255 Wis. 2d 194, ¶106.[10] As such, the facts of this case, upon which Christen must rely for his as-applied challenge, are that he was not operating or going armed with a firearm in self-defense.

¶46 Christen also seems to infer that his consuming intoxicants in his own home is a relevant fact that makes Wis. Stat. § 941.20(1)(b) unconstitutional as applied to him. By this assertion, he could mean various things. His argument is less than cogent. However, if he were to possess his firearm in his home and not ingest any intoxicants, this statute would not

---

[10] Christen does not assert that the self-defense jury instruction was flawed. Furthermore, Christen does not assert that the scope of the self-defense jury instruction contradicts the scope of self-defense that the Second Amendment protects. As such, we will not develop this argument for him. See Serv. Emp. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶24, 393 Wis. 2d 38, 946 N.W.2d 35 ("We do not step out of our neutral role to develop or construct arguments for parties; it is up to them to make their case."). Accordingly, we assume, without deciding, that the scope of the self-defense jury instruction is commensurate with the scope of self-defense that the Second Amendment protects.

20

be implicated. If he were ingesting intoxicants, in his home, and possessing his firearm, that is not prohibited under the statute unless he reaches the point of intoxication. If he were to possess his firearm in self-defense, even if intoxicated, he would have a defense under Wis. Stat. § 939.48. Here, the jury concluded that he possessed his firearm, while he was intoxicated, and that he was not acting in self-defense. That is in fact a violation of § 941.20(1)(b).

¶47 As a general rule, it is not illegal to possess a firearm. Similarly, it is generally not illegal to be intoxicated in one's own home. Furthermore, the right to self-defense is "most acute" in the home. Heller, 554 U.S. at 628. However, Christen's assertion that the Second Amendment allows him to possess a firearm in his own home even though he is at the point of intoxication, regardless of whether he is acting in self-defense, misses the mark.

¶48 Here, the jury had to conclude that Christen was not merely consuming intoxicants in his own home——the jury had to conclude that Christen was instead intoxicated, which means "under the influence of an intoxicant." "Under the influence of an intoxicant" is a legal term in Wisconsin law that requires, as the jury concluded, that "the defendant's ability to handle a firearm was materially impaired because of the consumption of an alcoholic beverage." Wis. JI——Criminal 1321, at 1 (2019). For the jury to find that someone was "under the influence," the State must establish beyond a reasonable doubt that "the person [had] consumed a sufficient amount of alcohol to cause the

21

person to be less able to exercise the clear judgment and steady hand necessary to handle a firearm." Id. at 2. Because the jury here found Christen guilty of operating or going armed with a firearm while intoxicated, the jury had to conclude that he was intoxicated and "less able to exercise the clear judgment and steady hand necessary to handle a firearm." Id.

¶49 Moreover, this case does not present a factual scenario wherein a person was drinking intoxicants in his or her own home, alone, and possessing a gun. The facts of this as-applied challenge indeed reflect that Christen was not merely in his home ingesting alcoholic beverages and possessing his firearm. The facts of this case are that Christen was in a shared apartment with his two cohabitants and two other guests. The circumstances were such that the jury concluded that Christen was disorderly, and that he operated or went armed with a firearm while he was intoxicated and that he was not acting in self-defense.

¶50 Consequently, we are not persuaded that Wis. Stat. § 941.20(1)(b) strikes at Christen's fundamental core Second Amendment right to possess or carry a weapon for self-defense, pursuant to the Second Amendment. This militates against applying strict scrutiny.

ii. Wisconsin Stat. § 941.20(1)(b) does not impose
a severe burden on Christen's core
Second Amendment right.

¶51 Furthermore, Wis. Stat. § 941.20(1)(b) has limited application. The statute does not strip the intoxicated

22

individual of the right to self-defense——the statute does not strip firearm owners of the right to own and possess the firearm. Section 941.20(1)(b) also does not prohibit a firearm from being in a home or provide that the gun be rendered inoperable if someone in the home is intoxicated. Rather, it limits the circumstances under which the lawful firearm owner may use or carry the firearm, specifically while intoxicated. But this restriction is even more limited, as it does not apply when the intoxicated individual uses or carries the firearm in self-defense. Section 941.20(1)(b) sets forth a limited restriction that imposes a slight burden on the core right of the Second Amendment. See Weber, 2020 WL 7635472, at ¶30 (concluding that the burden on Second Amendment rights by an intoxicated use of a firearm statute was "very slight"). Such a slight burden counsels us to apply intermediate scrutiny to Christen's challenge as well.[11]

¶52 Because Wis. Stat. § 941.20(1)(b) does not strike at the core right of the Second Amendment, due to the jury's determination that Christen did not act in self-defense, and any

---

[11] We note that numerous other courts have applied intermediate scrutiny in challenges to regulations on firearms far more restrictive than the restriction that Wis. Stat. § 941.20(1)(b) may impose. See, e.g., Roundtree, 395 Wis. 2d 94 (applying intermediate scrutiny to a complete prohibition on firearm possession by convicted felons); Stimmel v. Sessions, 879 F.3d 198, 206 (6th Cir. 2018) (applying intermediate scrutiny to a complete prohibition on firearm possession by individuals previously convicted of a misdemeanor crime of domestic violence); Mai, 952 F.3d at 1115 (applying intermediate scrutiny to a complete prohibition on firearm possession by mentally ill individuals).

23

burden it does impose on that core right is slight in this case, we conclude that Christen's as-applied challenge to § 941.20(1)(b) requires the application of intermediate scrutiny.[12]

b. Application of intermediate scrutiny

¶53  "Pursuant to an intermediate scrutiny analysis, we ask whether a law is substantially related to an important governmental objective." Roundtree, 395 Wis. 2d 94, ¶28.

¶54  "[W]e recognize public safety generally, and preventing gun violence specifically, as important governmental objectives. Indeed, '[p]ublic safety and the protection of human life is a state interest of the highest order.'" Id., ¶43 (quoting State v. Miller, 196 Wis. 2d 238, 249, 538 N.W.2d 573 (Ct. App. 1995)) (citations omitted). Even more relevant to this case, the State has a legitimate interest "in protecting people from harm from the combination of firearms and alcohol." Weber, 2020 WL 7635472, at ¶32; see also People v. Wilder, 861 N.W.2d 645, 653 (Mich. Ct. App. 2014) ("The extreme danger posed

---

[12] The determination that intermediate scrutiny is the appropriate level of scrutiny is consistent with other courts that have addressed a statute similar to Wis. Stat. § 941.20(1)(b). See, e.g., Weber, 2020 WL 7635472, at ¶31; People v. Deroche, 829 N.W.2d 891, 897 (Mich. Ct. App. 2013). Our conclusion does not, however, exclude the possibility that another level of scrutiny could apply to a different statute or under different facts. See Heller, 554 U.S. at 628 n.27 (leaving open the question of the appropriate level of heightened scrutiny); United States v. Marzzarella, 614 F.3d 85, 96 (3d Cir. 2010) (noting that strict scrutiny may apply to a Second Amendment challenge depending on the facts and circumstances of the challenge).

24

by a drunken person with a gun is real and cannot be over emphasized.").

¶55 Christen argues that Wis. Stat. § 941.20(1)(b) is not substantially related to these important governmental interests because the statute criminalizes going armed while intoxicated which does not impact public safety. Specifically, he asserts that the statute "does not require the defendant [to] pull the trigger, or cause injury of any sort, or even create a dangerous situation for another." Beyond these general arguments, Christen explains that he was not engaged in any unlawful or uncommon behaviors. Rather, "he merely had a few drinks over the course of an evening" and was defending himself, despite the jury's conclusion that he did not act in self-defense. As such, he claims that, based on the facts of his case, § 941.20(1)(b) is not substantially related to the important governmental objectives identified.

¶56 We disagree. Wisconsin Stat. § 941.20(1)(b) is substantially related to the important interest of "protecting people from harm from the combination of firearms and alcohol." Weber, 2020 WL 7635472, at ¶32.

¶57 The statute criminalizes operating or going armed with a firearm only while the individual is "under the influence of an intoxicant." Wis. Stat. § 941.20(1)(b). The phrase "under the influence of an intoxicant" is satisfied only when "the defendant's ability to handle a firearm was materially impaired because of consumption of an alcoholic beverage." Wis. JI— Criminal 1321, at 1 (2019). As the Ohio Supreme Court aptly

25

explained, "[w]hen an intoxicated person carries or uses a gun, either at home or outside the home, the impairment of cognitive functions and motor skills can result in harm to anyone around the intoxicated person and even to the intoxicated person himself or herself." Weber, 2020 WL 7635472, at ¶33. Even in the event that the firearm is unloaded, there is still a danger that the individual will harm the public. See id., at ¶¶43-44 (explaining the danger that an unloaded firearm may cause in the hands of an intoxicated individual). Accordingly, § 941.20(1)(b) furthers the important governmental interest of protecting the public.

¶58 The State points to cases from foreign jurisdictions to support its argument that Wis. Stat. § 941.20(1)(b) is substantially related to public safety. Of those cases, we find State v. Weber from Ohio the most persuasive.[13] As the Ohio Supreme Court recognized, "[r]esearch shows that 'people who abuse alcohol or illicit drugs are at an increased risk of committing acts of violence.'" Id., ¶36 (quoting Webster & Vernick, Keeping Firearms from Drug and Alcohol Abusers, 15

---

[13] Although the State cites to the Court of Appeals of Ohio's decision in Weber, the Ohio Supreme Court subsequently reviewed the Court of Appeals of Ohio's decision. Weber, 2020 WL 7635472, at ¶1. The Ohio Supreme Court's decision was announced after briefing was completed in this case. As such, we look to the analysis and reasoning of the Ohio Supreme Court because the data in that case are general and assist our inquiry in this case. Cf. Roundtree, 395 Wis. 2d 94, ¶50 (citing studies from Kanter v. Barr, 919 F.3d 437, 449 (7th Cir. 2019), to support its conclusion that the statute at issue was substantially related to an important governmental interest).

26

Injury Prevention 425 (2009)).[14] Beyond even a general risk of violence, "[s]tudies show that there is a strong correlation between heavy drinking and self-inflicted injury, including suicide, from a firearm." Id. (citing Branas, Han & Wiebe, Alcohol Use and Firearm Violence, 38 Epidemiologic Reviews 32, 36 (2016)). Horrifically, "[f]or men, deaths from alcohol-related firearm violence equal those from alcohol-related motor vehicle crashes." Id. (quoting Garen Wintemute, Alcohol Misuse, Firearm Violence Perpetration, and Public Policy in the United States, 79 Preventive Medicine 15 (2015)). These data support a substantial relationship between intoxicated use of firearms and public safety, preventing gun violence, and the protection of human life.

¶59 Our case law provides examples of the dangerous combination of alcohol and firearms. See, e.g., Larson v.

---

[14] The Ohio Supreme Court expounded on this statement:

The victims of such violence are often a gun owner's family members or the gun owner himself. For example, "[d]rug and alcohol use by domestic abusers has been strongly linked with the perpetration of fatal and non-fatal domestic violence." [Webster & Vernick, Keeping Firearms from Drug and Alcohol Abusers, 15 Injury Prevention 425 (2009).] "[A]n overwhelming proportion (70%) of [intimate-partner] homicide perpetrators were under the influence of substances when the crime occurred, . . . and the use of alcohol is a strong predictor of intimate terrorism of women." Darryl W. Roberts, Intimate Partner Homicide: Relationships to Alcohol and Firearms, 25 J.Contemp.Crim.Just. 67, 70 (2009).

Weber, 2020 WL 7635472, at ¶36.

27

State, 86 Wis. 2d 187, 271 N.W.2d 647 (1978) (addressing a case of homicide while intoxicated); Jones v. State, 70 Wis. 2d 41, 233 N.W.2d 430 (1975) (same); State v. Witkowski, 143 Wis. 2d 216, 420 N.W.2d 420 (Ct. App. 1988) (addressing a case of armed robbery while the defendant "appeared to be intoxicated").

¶60 Therefore, the State has important governmental interests in public safety, preventing gun violence, protecting human life, and protecting people from the harm the combination of firearms and alcohol causes. The means the legislature chose to further these important objectives, Wis. Stat. § 941.20(1)(b), is substantially related to the important governmental objectives. Indeed, "[i]t is difficult to understand how the government could have attempted to further that interest in any other viable manner." Weber, 2002 WL 7635472, at ¶39.

¶61 The specific facts of Christen's case do not cast doubt upon this conclusion. As we discussed above, the jury rejected Christen's claim that he was acting in self-defense. Christen does not supply or allege any other facts that would call into question the constitutionality of the statute as applied to him. The specific facts of Christen's case demonstrate why Wis. Stat. § 941.20(1)(b) is substantially related to public safety and preventing gun violence. The jury found that Christen was so intoxicated that he was "less able to exercise the clear judgment and steady hand necessary to handle a firearm." See Wis. JI——Criminal 1321, at 2 (2019). Christen

threatened his roommates and their guests numerous times. As he stated on the 911 call, "[i]f someone comes through [his] door, they're getting a fucking face full of lead." The studies and data noted above demonstrate that there was a real risk that the combination of Christen's intoxication and his firearms would cause harm to those around him. Thus, the facts of this case demonstrate why § 941.20(1)(b) is substantially related to public safety, preventing gun violence, protecting human life, and protecting people from the harm the combination of firearms and alcohol causes.

¶62 Accordingly, we conclude that Christen's as-applied challenge to Wis. Stat. § 941.20(1)(b) fails.

## IV. CONCLUSION

¶63 As to Christen's as-applied challenge, we conclude Wis. Stat. § 941.20(1)(b) does not strike at the core right of the Second Amendment because he did not act in self-defense. Moreover, we conclude that § 941.20(1)(b) does not severely burden his Second Amendment right. Accordingly, we apply intermediate scrutiny to Christen's as-applied challenge. Because § 941.20(1)(b) is substantially related to the important government objective of protecting public safety, it survives intermediate scrutiny as applied to Christen.

¶64 Accordingly, we conclude that Christen's as-applied challenge to Wis. Stat. § 941.20(1)(b) fails. Therefore, we affirm.

*By the Court.*—The decision of the court of appeals is affirmed.

¶65 BRIAN HAGEDORN, J. *(concurring)*. The Second Amendment to the United States Constitution protects the individual right to keep and bear arms. This right is broad, but it does not always prohibit the state from taking focused, prophylactic measures to protect against gun-related violence. Earlier this term, I concluded in dissent that the state did not meet its burden to prove a substantial relationship between dispossessing a felon convicted of failing to pay child support for 180 days and preventing gun-related violence. See State v. Roundtree, 2021 WI 1, ¶¶105-71, 395 Wis. 2d 94, 952 N.W.2d 765 (Hagedorn, J., dissenting). This case provides another opportunity for this court to explore the contours of the rights protected by the Second Amendment. The court concludes——and I agree——that Mitchell Christen's conviction for operating or going armed with a firearm while intoxicated does not violate the Second Amendment. However, in my view, the majority's analysis is insufficiently rooted in the original public meaning of the Second Amendment. Therefore, I reach the same underlying conclusion, but rest instead on the history of the Second Amendment right as understood when adopted and incorporated against the states.

## I. BACKGROUND

¶66 Christen's conviction stems from events that took place during the early-morning hours of February 3, 2018, in a Madison apartment he shared with two roommates. Christen estimated that, over the course of the evening, he consumed four

1

beers and one shot. After returning to his apartment, Christen argued with one of his roommates and one of his roommate's friends. At one point, Christen, who was in his bedroom, picked up a gun and "held it sideways towards the wall away from" his roommate's friend, prompting the friend to shut Christen's bedroom door.

¶67 After that exchange, Christen began recording a video with his cell phone. He announced that he was going to the kitchen and bringing a gun with him because he did not "trust anybody in this house." Christen emerged from his bedroom with a handgun tucked into his waistband and went to the kitchen. The friend Christen previously threatened disarmed him and another friend disassembled the gun. Christen retreated to his bedroom, where he retrieved a shotgun and cocked it. From his bedroom, Christen dialed 911 to report a stolen firearm; police responded, and Christen was arrested. The responding officer noted that Christen bore several indicators of intoxication.

¶68 Christen was charged with pointing a firearm at another, operating or going armed with a firearm while intoxicated, and disorderly conduct. Christen moved the circuit court[1] to dismiss the second charge, arguing that a conviction under Wis. Stat. § 941.20(1)(b) (2017-18)[2] would violate his right to bear arms within his home. The circuit court denied

---

[1] The Honorable Nicholas J. McNamara of the Dane County Circuit Court presided.

[2] All subsequent references to the Wisconsin Statutes are to the 2017-18 version.

2

that motion, and a jury convicted him of disorderly conduct and operating or going armed with a firearm while intoxicated under § 941.20(1)(b). Christen appealed the circuit court's denial of his motion to dismiss, which the court of appeals affirmed. State v. Christen, No. 2019AP1767-CR, unpublished slip op. (Wis. Ct. App. Mar. 17, 2020). This court granted Christen's petition for review.

## II. DISCUSSION

¶69 Wisconsin Stat. § 941.20(1)(b) provides that a person who "[o]perates or goes armed with a firearm while he or she is under the influence of an intoxicant" is guilty of a Class A misdemeanor. Put simply, § 941.20(1)(b) criminalizes armed intoxication. Christen challenges the constitutionality of this provision as applied to him. Therefore, we look to the specific facts of his case, not to hypothetical or different facts. See State v. Hamdan, 2003 WI 113, ¶43, 264 Wis. 2d 433, 665 N.W.2d 785. When analyzing an as-applied challenge, it generally does not matter whether the statute might have some applications that are contrary to the Constitution if the defendant's own conviction lacks a constitutional defect. See State v. Wood, 2010 WI 17, ¶13, 323 Wis. 2d 321, 780 N.W.2d 63. An as-applied challenge therefore attacks the application of the statute——a conviction in this case——rather than the statute itself. See Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶37, 393 Wis. 2d 38, 946 N.W.2d 35.

3

¶70 In my dissenting opinion in Roundtree, 395 Wis. 2d 94, ¶¶105-71 (Hagedorn, J., dissenting), I explained that the original public meaning of the Second Amendment should guide the constitutional analysis, and why the historical record is of particular import to this inquiry. I begin with a brief summary of these principles, then review the historical record, and finally, apply this to the facts of Christen's case.

A. Principles of Interpretation

¶71 Under our Constitution, the people declared that the government has no power to regulate in certain areas, and therefore it may not criminalize conduct in those areas. See Cohen v. California, 403 U.S. 15, 18-19 (1971); Roundtree, 395 Wis. 2d 94, ¶109 (Hagedorn, J., dissenting). Many of these limits are found in the federal Constitution's Bill of Rights—among them, the Second Amendment's protection of the right "to keep and bear Arms." U.S. Const. amend. II; McDonald v. City of Chicago, 561 U.S. 742, 791 (2010).

¶72 The primary interpretive tool in constitutional analysis is the constitutional text, informed by its context and structure. District of Columbia v. Heller, 554 U.S. 570, 576-77 (2008); Vos, 393 Wis. 2d 38, ¶28. The Second Amendment says, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The text's reference to "the right of the people" recognizes that the Second Amendment "codified a pre-existing right" to keep and bear arms,

4

one already held by the people when the Second Amendment was adopted. Heller, 554 U.S. at 592. The Second Amendment therefore referenced a right with a preexisting scope and substance, and gave it protection in our fundamental law. Id.

¶73 The scope and substance of a constitutional right articulated in the text may be informed by the historical record. Vos, 393 Wis. 2d 38, ¶28 n.10. In the Second Amendment context, it is not immediately apparent, more than two centuries removed from its enactment, precisely what fell within the full reach of "the right of the people to keep and bear Arms," nor whether and when the government may enact laws touching upon firearm possession, carrying, and use. Young v. State, ___ F.3d ___, 2021 WL 1114180, at *13 (9th Cir. 2021) (en banc); Roundtree, 395 Wis. 2d 94, ¶122 (Hagedorn, J., dissenting). Nevertheless, by looking to the historical record, "we can discern the principal themes" that inform what the public understood the provision to mean when it was adopted. Young, ___ F.3d ___, at *13; Roundtree, 395 Wis. 2d 94, ¶114 (Hagedorn, J., dissenting). "The meaning of the text as enlightened by the historical record is no less binding because the historical inquiry is still directed toward discovering what the words were understood to convey when written." Roundtree, 395 Wis. 2d 94, ¶114 (Hagedorn, J., dissenting). Therefore, our task in this case is to study the historical record to learn whether the right protected by the Second Amendment protects armed intoxication.

5

B. Armed Intoxication

¶74 The Second Amendment protects the longstanding, natural right to self-defense, but even as originally understood, this core right was not unlimited in scope; some regulation was permitted. Heller, 554 U.S. at 595; Roundtree, 395 Wis. 2d 94, ¶¶125, 129 (Hagedorn, J., dissenting). When the Second Amendment was adopted, and later incorporated against the states,[3] laws restricting the right to keep and bear arms were rare, but did exist. See McDonald, 561 U.S. at 770-77. "Those that existed were largely aimed at persons or classes of people who might violently take up arms against the government in rebellion, or at persons who posed a more immediate danger to the public." Roundtree, 395 Wis. 2d 94, ¶129 (Hagedorn, J., dissenting).

¶75 It appears that no jurisdiction had a law criminalizing armed intoxication on its books when the Second Amendment was adopted in 1791. See State v. Weber, ___ N.E.3d ___, ¶85, 2020 WL 7635472 (Ohio 2020) (DeWine, J., concurring) ("It seems clear that laws identical to R.C.

---

[3] "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." District of Columbia v. Heller, 554 U.S. 570, 634-35 (2008). The Second Amendment was ratified in 1791, but when analyzing the Second Amendment's meaning as incorporated against the states under the Fourteenth Amendment, "the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." Ezell v. City of Chicago, 651 F.3d 684, 702 (7th Cir. 2011) (citing McDonald v. City of Chicago, 561 U.S. 742, 770-77 (2010)). Therefore, our study of the Second Amendment's historical record includes both the Founding and Reconstruction Eras.

6

2923.15 [criminalizing armed intoxication] did not exist at the time of the founding."). However, the historical record suggests states could permissibly curtail the reckless handling of firearms and recognized the aggravating nature of intoxication, particularly when paired with weapons.

¶76 One set of laws along these lines prohibited firing a gun under circumstances where doing so would be reckless. A 1655 Virginia law required anyone who fired a gun while intoxicated to forfeit 100 pounds of tobacco.[4] A New York law from the same era prohibited firing guns on New Year's and May Days, recognizing the "deplorable accidents such as wounding" caused by the drunken handling of weapons on those days.[5] A 1774 Pennsylvania law similarly prohibited firing a gun without reason around New Year's.[6] And a 1785 New York law did the same for "the eve of the last day of December, and the first and second days of January."[7]

¶77 In addition, stretching back to 1840, states have in various ways forbidden the reckless brandishing of a weapon when

---

[4] Act of March 10, 1655, 1655 Va. Laws 401-02.

[5] Ordinance of The Director General and Council of New Netherland to Prevent Firing Of Guns, Planting May Poles and Other Irregularities Within This Province, 1665 N.Y. Laws 205.

[6] An Act to Suppress the Disorderly Practice of Firing Guns, etc., on the Times Therein Mentioned, 1759-1776 Pa. Acts 421, § 1.

[7] An Act to Prevent the Firing of Guns and other Fire Arms within this State on Certain Days Therein Mentioned, 1784-1785 N.Y. Laws 152.

not necessary for self-defense. An 1840 Mississippi law provided:

> If any person having or carrying any dirk, dirk knife, Bowie knife, sword, sword cane, or other deadly weapon, shall, in the presence of three or more persons, exhibit the same in a rude, angry and threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in the circuit or criminal court of the proper county, shall be fined in a sum not exceeding five hundred dollars, and be imprisoned not exceeding three months.[8]

An 1854 Washington law followed suit, making it a crime to "in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon."[9] And an 1855 California law similarly made it illegal to "draw or exhibit any of said deadly weapons in a rude, angry and threatening manner, not in necessary self-defense . . . in any fight or quarrel."[10] During the 1860s and 70s, several more states adopted similar laws criminalizing brandishing a weapon when not necessary for self-defense, including: Idaho in 1864,

---

[8] Volney Erskine Howard, The Statutes of the State of Mississippi of a Public and General Nature, with the Constitutions of the United States and of this State: And an Appendix Containing Acts of Congress Affecting Land Titles, Naturalization, and a Manual for Clerks, Sheriffs and Justices of the Peace 676 (1840).

[9] An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, 1854 Wash. Sess. Law 80, ch. 2, § 30.

[10] William H.R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858 334 (1861).

8

Texas in 1866, Arizona in 1867, Arkansas in 1868, Nevada in 1873, and Indiana in 1875.[11]

¶78 It is also clear that founding-era governments had broad power to regulate intoxication, even when doing so might impinge on certain fundamental rights. One early Ohio territorial statute provided that if "any person by being intoxicated, shall be found making or exciting any noise, contention or disturbance, at any tavern, court, election, or other meeting" that person could be fined or imprisoned until "such court, election or meeting is over."[12] Another law, an 1811 Maryland statute, forbade selling "spirituous or fermented liquors" on election days. Cearfoss v. State, 42 Md. 403, 406 (1875). "Simply because the right to vote and the right to assemble were considered fundamental rights did not mean that

---

[11] An Act Concerning Crimes and Punishments, 1864 Id. Sess. Laws 304, § 40; George Washington Paschal, 2 A Digest of the Laws of Texas:  Containing Laws in Force, and the Repealed Laws on Which Rights Rest 1321 (1873); An Act to Prevent the Improper Use of Deadly Weapons and the Indiscriminate Use of Fire Arms in the Towns and Villages of the Territory, 1867 Ariz. Sess. Laws 21-22, § 1; 1868 Ark. Acts 218, §§ 12-13; An Act to Amend an Act Entitled "An Act Concerning Crimes and Punishments," 1873 Nev. Stat. 118, ch. 62, § 1; An Act Defining Certain Misdemeanors, and Prescribing Penalties Therefore, 1875 Ind. Acts 62, § 1.

These and other relevant laws can be accessed via the Repository of Historical Gun Laws at the Duke Center for Firearms Law.   https://firearmslaw.duke.edu/repository/search-the-repository/.

[12] Salmon P. Chase, Statutes of Ohio and of the Northwestern Territory, Adopted or Enacted from 1788 to 1833 Inclusive: Together with the Ordinance of 1787; the Constitutions of Ohio and of the United States, and Various Public Instruments and Acts of Congress 503 (1833).

the government could not restrain someone from exercising those rights while they were intoxicated." Weber, ___ N.E.3d ___, ¶107 (DeWine, J., concurring). So too, it seems, with the fundamental right protected under the Second Amendment.

¶79 The Reconstruction Era presents the most direct evidence that laws prohibiting armed intoxication are permissible under the Second Amendment. In 1868, the same year the Fourteenth Amendment was ratified, Kansas adopted the following law:

> Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state carrying on his person a pistol, bowie-knife, dirk, or other deadly weapon, shall be subject to arrest upon charge of misdemeanor, and upon conviction shall be fined a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.[13]

This law prohibits carrying a firearm while "under the influence of intoxicating drink"——precisely the conduct criminalized under Wis. Stat. § 941.20(1)(b). The temporal connection between this prohibition on armed intoxication and the Fourteenth Amendment's ratification is strong evidence that the Second Amendment, particularly as incorporated against the states, was not originally understood to preclude states from criminalizing armed intoxication.

¶80 An 1878 Mississippi law is also insightful:

---

[13] 2 General Statutes of the State of Kansas 353 (1897) (emphasis added).

10

It shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described [which included pistols], or any pistol cartridge, on any conviction shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court, not exceeding six months.[14]

This law attempted to limit the reckless handling of firearms by forbidding the sale of firearms to minors or intoxicated individuals.  If states could criminalize selling arms to intoxicated individuals, the same rationale would support the conclusion that states could also temporarily prohibit intoxicated individuals from handling guns.

¶81  Viewing this evidence as a whole, the right to keep and bear arms has never prevented governments from enacting reasonable regulations to curtail the reckless handling of firearms, such as prohibitions on firing in a crowded area or brandishing a firearm in ways dangerous to others and not in self-defense.  And the unique danger of intoxication when combined with potentially deadly force has long been acknowledged.  Moreover, the founding-era historical record suggests, and the reconstruction-era evidence confirms, that one way the government could curtail the reckless handling of firearms was by criminalizing armed intoxication.  Therefore, at least as a general matter, laws forbidding armed intoxication do not violate the Second Amendment right to keep and bear arms.

---

[14] An Act to Prevent the Carrying of Concealed Weapons and for Other Purposes, 1878 Miss. Laws 175, § 2.

11

¶82 In view of this historical evidence, we need not employ an additional implementing doctrine such as intermediate or strict scrutiny to conclude that the Wis. Stat. § 941.20(1)(b) is not contrary to the Second Amendment's original public meaning in this context. This type of law fits comfortably within the historical record, and therefore no additional layer of legal analysis is necessary.[15]

## C. Application

¶83 With this backdrop, resolution of the case before us is straightforward. The Second Amendment, while protecting the right to carry a firearm generally, does not protect armed intoxication——at least not under the facts of this case.

¶84 A more nuanced analysis may be required if Christen was truly acting in self-defense. This is so because whatever else the Second Amendment means, it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Heller, 554 U.S. at

---

[15] The majority concludes intermediate scrutiny governs this constitutional inquiry, but it conspicuously declines to examine whether the Second Amendment's original understanding supports application of that framework in this context. See majority op., ¶¶38-39, 52. As the Ninth Circuit unanimously agreed, this approach runs contrary to Heller's explicit direction that the Second Amendment be interpreted in light of its historical record. Young v. State, ___ F.3d ___, 2021 WL 1114180, at *12 (9th Cir. 2021) (en banc) ("We do not think we can avoid the historical record. Heller relied heavily on history, and we do not think that it exhausted all subsequent need to confront our history in resolving challenges to other firearm regulations."); id. at *50-62 (O'Scannlain, J., dissenting) (following "Heller's historical imperative" to analyze the Second Amendment's historical record).

12

635. Christen invokes self-defense, but the facts simply do not support it. None of the four people in the apartment when Christen took up arms threatened to physically harm him. It seems that it is Christen who was the source of most of the discord that occurred that evening. Moreover, the jury rejected the statutory self-defense argument proffered by Christen.[16] In short, Christen's right to defend himself was not implicated. Under these facts, the Second Amendment does not protect Christen's right to take up arms notwithstanding his intoxication.

¶85 Therefore, Christen's conviction under Wis. Stat. § 941.20(1)(b) is consistent with the Second Amendment and his as-applied challenge fails. For these reasons, I respectfully concur.

---

[16] The jury was instructed on the statutory privilege of self-defense and returned a guilty verdict. This means the jury did not believe Christen satisfied the statutory prerequisites for self-defense codified in Wis. Stat. § 939.48. As the dissent points out, the Second Amendment right to self-defense is more expansive than the statutory privilege. Even so, the facts of this case do not lead us to those waters.

13

¶86 REBECCA GRASSL BRADLEY, J. *(dissenting).* The majority persists in ignoring the text and history of the Second Amendment, flouting controlling United States Supreme Court precedent——District of Columbia v. Heller, 554 U.S. 570 (2008)—— by doing exactly what Heller renounced. Although Heller "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing," McDonald v. City of Chicago, Ill., 561 U.S. 742, 785 (2010) (citing Heller, 554 U.S. at 633-35), the majority nevertheless concludes that "important governmental interests" override one of America's most cherished rights. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." Heller, 554 U.S. at 634-35.

¶87 The majority also misapprehends the difference between operating a firearm in self-defense and going armed in case of confrontation. The fact that Christen did not act in self-defense has nothing to do with his Second Amendment right to go armed in case of confrontation. While many readers may not be troubled by the outcome of this case in light of Christen's threatening behavior toward his roommates and their guests, the majority's decision erodes a fundamental freedom, the "true palladium of liberty" for all Americans. St. George Tucker, Blackstone's Commentaries 143 (1803).

¶88 Examining "both text and history" of the Second Amendment is necessary to understand the original public meaning

1

of the "individual right to keep and bear arms." Heller, 554 U.S. at 595. The majority neglects to review either. Textually, the individual right to keep and bear arms "guarantee[s] the individual right to possess and carry weapons in case of confrontation." Id. at 592. Historically, legislatures did not limit the ability of individuals to carry firearms while under the influence of an intoxicant. Because "'the need for defense of self, family, and property is most acute' in the home[,]" McDonald, 561 U.S. at 767 (quoting Heller, 554 U.S. at 628), a law prohibiting individuals from going armed while intoxicated cannot constitutionally be applied to an individual who goes armed in his own home. Wisconsin Stat. § 941.20(1)(b) violated Christen's right to carry a firearm in his own home in case of confrontation, notwithstanding his intoxication. I respectfully dissent.

## I. The Majority Applies an Incorrect Analytical Framework.

### A. Heller's Holding and Analytical Framework

¶89 The Second Amendment provides:

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II. Over a decade ago, the United States Supreme Court issued a decision in a "landmark case on the meaning of the Second Amendment," "writ[ing] on a slate that was almost clean" considering the dearth of Second Amendment jurisprudence from our nation's highest court. Lawrence B. Solum, District of Columbia v. Heller and Originalism, 103 Nw.

2

U. L. Rev. 923, 925, 980 (2009). In <u>Heller</u>, the Court held, "on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms"——a right which "belongs to all Americans." <u>Heller</u>, 554 U.S. at 581, 595. In doing so, the Court "dispelled the prevalent, but historically ignorant notion that the Second Amendment protects merely a collective, militia member's right." <u>State v. Roundtree</u>, 2021 WI 1, ¶65, 395 Wis. 2d 94, 952 N.W.2d 765 (Rebecca Grassl Bradley, J., dissenting). Although the Court wrote that the Second Amendment "conferred" the right, the Court clarified that "[t]he very text of the Second Amendment implicitly recognizes the <u>pre-existence</u> of the right and declares only that it 'shall not be infringed.'" <u>Heller</u>, 594 U.S. at 592 (emphasis added). Like other rights protected by the Constitution, the right to keep and bear arms "is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence." <u>Id.</u> (quoted source omitted). Instead, the Framers "codified a <u>pre-existing</u> right"——one that "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." <u>Id.</u> at 635.

¶90 But <u>Heller</u> did more than just confirm that the right to keep and bear arms is retained individually. It also set forth the proper analytical framework for courts to consider Second Amendment inquiries. In particular, the <u>Heller</u> Court arrived at its seminal holding by substantively analyzing the "<u>text and history</u>" of the Second Amendment's "operative clause":

3

"the right of the people to keep and bears Arms."[1]  Id. at 595 (emphasis added).

¶91  The Court determined that the phrase "the people"——as used in the First Amendment, the Second Amendment, the Fourth Amendment, and elsewhere in the Constitution——"unambiguously refers to all members of the political community, not an unspecified subset." Id. at 580.  After ascertaining the holder of the right——"the people"——the Court turned to its substance. The phrase "to keep [arms]" most reasonably means to "to have weapons" and the phrase "to bear arms" means "to carry arms." Id. at 581-84.  "The 18th-century meaning [of these phrases] is no different from the meaning today." Id. at 581.  Drawing upon a wealth of 18th century dictionaries and authorities (e.g., William Blackstone's Commentaries on the Laws of England), the Court declared these clauses "guarantee the individual right to possess and carry weapons in case of confrontation"——a conclusion "strongly confirmed by the historical background of the Second Amendment." Id. at 592 (emphasis added).

¶92  The Court then explored how the scope of the Second Amendment was understood during the founding era.  The Court first examined constitutions of four states——Pennsylvania, Vermont, North Carolina, and Massachusetts——that predated the federal Constitution.  Each state adopted language analogous to

---

[1] Drawing upon founding-era sources, the Court also analyzed the Second Amendment's "prefatory clause," which provides:  "A well regulated Militia, being necessary to the security of a free State." District of Columbia v. Heller, 554 U.S. 570, 595-98 (2008).

the Second Amendment regarding the right to bear arms. According to the Court, "the most likely reading of all four of these pre-Second Amendment state constitutional provisions is that they secured an individual right to bear arms for defensive purposes." Id. at 602. Post-ratification commentary supports this conclusion. Similar to William Blackstone, St. George Tucker understood the right to bear arms as "the palladium of liberty." Id. at 606 (citing 2 St. George Tucker, Blackstone's Commentaries 143 (1803)). Tucker declared "[t]he right to self defence is the first law of nature: in most governments it has been the study of rulers to confine the right within the narrowest limits possible. Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction." Id. (citing Tucker, infra, at 300). Other prominent scholars during the founding era——from William Rawle to Joseph Story to preeminent abolitionists——understood the Second Amendment in a similar light. Id. at 606-10. With only a single exception, all post-ratification commentators construed the Second Amendment "to protect an individual right unconnected with militia services," particularly in regard to confrontation and self-defense. Id. at 605-10.[2]

---

[2] The Court also extensively examined pre-civil war cases, post-civil war legislation, and post-civil war commentary to document the historical foundation for the Second Amendment. Heller, 554 U.S. at 610-19.

5

¶93 The Court then applied its textual interpretation and historical study to the particular restriction before the Court: the District of Columbia's ban on firearms, which the Court concluded was unconstitutional. Specifically, the Court determined that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." Id. at 635. "Assuming that Heller is not disqualified from the exercise of Second Amendment rights," concluded the Court, "the District must permit him to register his handgun and issue him a license to carry it in the home." Id.

¶94 The Heller Court was exhaustive in its historical research into the meaning of the Second Amendment. In considering the District of Columbia's firearm ban, at no point did the Court weigh the interests of the government against the Constitution's clear language, nor did it undertake the judicially-invented intermediate or strict scrutiny analysis preferred by many lower courts. Instead, it examined the text and history of the Second Amendment, asking whether the statute violated the original public meaning of the right to keep and bear arms. In doing so, the Court prescribed the proper method of interpretation for resolving challenges under the Second Amendment.

¶95 In employing this framework, the Heller Court decidedly rejected the sort of interest-balancing tests the majority applies in this case. As the Court explained, the

6

Second Amendment is "the very product of an interest balancing by the people." Id. at 635 (emphasis added). Just two years later, the Court reiterated this point, noting that Heller "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing[.]" McDonald, 561 U.S. at 785 (citing Heller, 554 U.S. at 633-35). "The very enumeration of the right takes out of the hands of government——even the Third Branch of Government——the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." Heller, 554 U.S. at 634.

¶96 Heller unequivocally superseded judicial balancing tests with an analysis of whether the original public meaning of the Second Amendment text, in the context of the history and tradition enveloping the right, would support the regulation or restriction challenged in a particular case. As then-Judge Brett Kavanaugh confirmed, "Heller and McDonald leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny." Heller v. District of Columbia, 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). And for good reason: "the Heller test [is] more determinate and 'much less subjective' because 'it depends upon a body of evidence susceptible of reasoned analysis rather than a variety of vague ethico-political First Principles whose combined conclusion can be found to point in any direction the

7

judges favor.'" Id. at 1275 (Kavanaugh, J., dissenting) (quoting McDonald, 561 U.S. at 804 (Scalia, J., concurring)).

¶97 While conducting this "historical analysis can be difficult," "it is the best means available in an imperfect world" and avoids "intrud[ing] . . . upon the democratic process." McDonald, 561 U.S. at 804 (Scalia, J., concurring) (emphasis in original). The Court "based [Heller] on the scope of the right to keep and bear arms as it was understood at the time of the adoption of the Second Amendment." New York State Rifle & Pistol Ass'n, Inc. v. City of New York, New York, ___ U.S. ___, 140 S. Ct. 1525, 1540 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting) (emphasis added). "Because history provided no support for laws like the District [of Columbia's]," the law at issue in Heller violated the individual right protected by the Second Amendment. Id. (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting) (emphasis added).

B. The Majority Eschews Heller's Framework.

¶98 Troublingly, although the United States Supreme Court has established a Second Amendment analytical framework rooted in text, history, and tradition, "many courts have resisted [the Court's] decisions in Heller and McDonald." Rogers v. Grewal, ___ U.S. ___, 140 S. Ct. 1865, 1866 (2020) (denying petition for writ of certiorari) (Thomas, J., dissenting). "Instead of following the guidance provided in Heller, these courts minimized that decision's framework. They then 'filled' the self-created 'analytical vacuum' with a 'two-step inquiry' that incorporates tiers of scrutiny on a sliding scale." Id.

8

(Thomas, J., dissenting) (internal quotations and citations omitted). "Under this test, courts first ask 'whether the challenged law burdens conduct protected by the Second Amendment. If so, courts proceed to the second step——determining the appropriate level of scrutiny," applying either intermediate or strict scrutiny. Id. at 1867 (Thomas, J., dissenting).

¶99 This is precisely the two-step process the majority of this court erroneously follows in the case before us. See majority op., ¶34. This "two-step inquiry" leads the majority to conclude that Wis. Stat. § 941.20(1)(b)——Wisconsin's law prohibiting individuals from going armed while intoxicated——may be constitutionally applied to Christen in his own home. Using this "entirely made up" judicial balancing test contravenes Heller and McDonald. Rogers, 140 S. Ct. at 1867 (Thomas, J., dissenting).

¶100 "The critical tool of constitutional interpretation in this area is examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification." Binderup v. Att'y Gen. United States of Am., 836 F.3d 336, 362 (3d Cir. 2016) (Hardiman, J., concurring) (emphasis in original) (internal quotations omitted). The two-step test applied by the majority in this case never takes up the "critical tools" of Heller's originalist and textualist approach, favoring Justice Stephen Breyer's outcome-oriented dissent in Heller instead. Rather than ascertaining the original public meaning of the Second

9

Amendment, Justice Breyer advocated "simply adopt[ing] . . . an interest-balancing inquiry explicitly," which would ask "whether [a] statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." Heller, 554 U.S. at 689-90 (Breyer, J., dissenting). The fact that both federal and state courts, including our own, have embraced Heller's dissent does not make it lawful. See, e.g., Kanter v. Barr, 919 F.3d 437 (7th Cir. 2019); State v. Weber, 2020-Ohio-6832, ___ N.E.3d ___. Not only does the two-step test run afoul of the law pronounced by the United States Supreme Court, it is antithetical to our duty to protect the people's rights as "established by a constitutional history formed by democratic decisions." McDonald, 561 U.S. at 805 (Scalia, J., concurring). The people should be alarmed that their constitutionally-guaranteed rights may be infringed whenever a majority of judges on a reviewing court quite subjectively decides the "salutary effects" of a regulation outweigh them, as the majority does in this case.

10

¶101 The majority's two-step approach is not only wrong,[3] its application in this case is decidedly haphazard. The majority conducts a meager review of the first step——that is, whether Wis. Stat. § 941.20(1)(b) burdens conduct protected by the Second Amendment. Confusingly, the majority concludes the statute "does not strike at the core right of the Second Amendment" but in the next sentence contradicts itself, saying the statute "does not severely burden [that] right." Majority op., ¶¶3, 63. Logically, if a right is not even implicated, it cannot be burdened. Rather than engaging in what it acknowledges should be "a textual and historical inquiry" the majority instead skips to the second step, employing intermediate scrutiny in order to elevate "important governmental objectives" over a fundamental individual right. See majority op., ¶¶36, 39, 60. It selects the wrong test and then applies only part of it. The majority's decision to employ means-end scrutiny——abandoning any meaningful inquiry into the protections afforded to the people under the Second Amendment because, in its mind, the historical record is "debatable"——

---

[3] The right to keep and bear arms is a "species of right we denominate as fundamental." State v. Roundtree, 2021 WI 1, ¶72, 395 Wis. 2d 94, 952 N.W.2d 765 (Rebecca Grassl Bradley, J., dissenting) (quoting Wisconsin Carry, Inc. v. City of Madison, 2017 WI 19, ¶9, 373 Wis. 2d 543, 892 N.W.2d 233). If a statute restricts a fundamental right, this court applies strict scrutiny review. Id., ¶73 (citing Mayo v. Wisconsin Injured Patients & Families Comp. Fund, 2018 WI 78, ¶28, 383 Wis. 2d 1, 914 N.W.2d 678). Accordingly, if this court insists on applying a judicial balancing test in reviewing a statute restricting the right to keep and bear arms (notwithstanding Heller's contrary direction), the intermediate scrutiny the majority applies in Christen's case is in error.

11

lends the majority a license to declare the meaning of the Constitution's "list of protected rights" as "whatever [it] wish[es] it to be." McDonald, 561 U.S. at 805 (Scalia, J., concurring). Under the majority's approach, Second Amendment analysis becomes a "system in which . . . judges always get their way": if the court's "balancing" weighs in favor of stripping individuals of protected rights, then so it shall be. Id. (Scalia, J., concurring). Ungrounded in text or history, the majority's approach subjects a fundamental constitutional right to the will, rather than the judgment, of the judiciary.

¶102 Using a balancing test in Second Amendment cases facilitates judicial contortions utterly untethered to the original meaning of the Constitution. The majority's reliance upon social science research to buoy its means-end analysis illuminates the problem. To support the State's proffered "substantial interest" in prohibiting intoxicated individuals from carrying firearms, the majority cites "studies show[ing] that there is a strong correlation between heavy drinking and self-inflicted injury" due to a firearm. See majority op., ¶58 (quoted source omitted). Because the results of social science studies are unavoidably imbued with the biases of their authors and their interpretation subject to society's evolving sensitivities, courts should never "consult social science research to interpret the Constitution." State v. Roberson, 2019 WI 102, ¶84, 389 Wis. 2d 190, 935 N.W.2d 813 (Rebecca Grassl Bradley, J., concurring); see Missouri v. Jenkins, 515 U.S. 70, 119-20 (1995) (Thomas, J., concurring). "Only the

12

Constitution can serve as a reliable bulwark of the rights and liberty of the people." Roberson, 389 Wis. 2d 190, ¶86 (Rebecca Grassl Bradley, J., concurring). In the majority's estimation, if social science dictates that the State's interest in regulating firearms is "substantial," then it may circumscribe constitutional rights in conformance with the research of the day.

¶103 Constitutional rights rest on perilously fragile footing if they may be curtailed by subjective judicial predilections. Only the text and history of the Second Amendment should inform the analysis of whether Wis. Stat. § 941.20(1)(b)——Wisconsin's law prohibiting an intoxicated individual from going armed with a firearm in his own home——may be constitutionally applied to Christen. Text and history show it may not.

II. Wisconsin Stat. § 941.20(1)(b) As Applied to Christen

¶104 In full, Wis. Stat. § 941.20(1)(b) reads:

(1) Whoever does any of the following is guilty of a Class A misdemeanor:

. . .

(b) Operates or goes armed with a firearm while he or she is under the influence of an intoxicant.

(Emphasis added.) This statute criminalizes going armed with a firearm while intoxicated, even within the confines of one's home. The State charged Christen for going armed with a firearm while intoxicated in violation of § 941.20(1)(b) and the jury convicted him.

13

¶105 Christen challenges the constitutionality of Wis. Stat. § 941.20(1)(b) as applied to him. The record shows that Christen did not operate a firearm while under the influence of an intoxicant. Instead, Christen went armed with (carried) a firearm while under the influence of an intoxicant. "[I]n an as-applied challenge, we assess the merits of the challenge by considering the facts of the particular case in front of us, 'not hypothetical facts in other situations.'" League of Women Voters of Wisconsin Educ. Network, Inc. v. Walker, 2014 WI 97, ¶13, 357 Wis. 2d 360, 851 N.W.2d 302. Accordingly, the analysis is limited to Christen's right to "go[] armed with a firearm"—not his ability to "operate" one.

¶106 A review of the text and history of the Second Amendment establishes that Wis. Stat. § 941.20(1)(b) is unconstitutional as applied to Christen. The Second Amendment does not countenance restricting Christen's fundamental right to go armed in his own home, even while under the influence of an intoxicant. Historically, legislatures did not limit the ability of individuals to carry firearms while under the influence of an intoxicant, and the Second Amendment affords heightened protections of the right as exercised in the home. Accordingly, Wis. Stat. § 941.20(1)(b) unconstitutionally infringed Christen's right to bear arms within his own home.

## A. Legislatures did not historically limit an individual's right to bear arms while under the influence of an intoxicant.

¶107 Contrary to the majority's mode of analysis, "Heller signals that courts should approach challenges to statutes

14

infringing the Second Amendment right with a <u>rigorous review of</u> <u>history</u>, rather than the inherently subjective consideration of whether the government's interest in curtailing the right outweighs the individual's interest in exercising it." <u>Roundtree</u>, 395 Wis. 2d 94, ¶75 (Rebecca Grassl Bradley, J., dissenting) (emphasis added). From before the enactment of the Second Amendment through the late-18th and early-19th centuries, legislatures did not limit the individual right to bear arms while under the influence of an intoxicant. Indeed, few colonial-era laws even regulated the <u>use</u> of firearms while consuming alcohol, and none dealt with <u>carrying</u> while intoxicated. <u>See</u> Mark Frassetto, <u>Firearms and Weapons</u> <u>Legislation up to the Early 20th Century</u> (January 15, 2013).[4] For example, in 1655 Virginia passed a law stating: "What persons or persons soever shall, after publication hereof, <u>shoot</u> any guns at drinking (marriages and funerals only excepted) that such person or persons so offending shall forfeit 100 lb. of tobacco . . . ." 1655 Va. Acts 401, Acts of March 10, 1655, Act XII (emphasis added). This law had nothing to do with bearing a firearm while drinking; instead, it prohibited <u>shooting</u> while drinking, although shooting guns while celebrating a marriage or mourning a death was completely lawful.

¶108 Other states regulated the firing of guns on particular occasions. A 1665 New York law, for example, stated: "Whereas experience hath demonstrated and taught that . . . much

---

[4] This source is readily available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2200991.

15

Drunkenness and other insolence prevail on New Year's and May Days, by firing of guns, . . . [which leads] to deplorable accidents such as wounding, . . . the director General . . . expressly forbids from this time forth all firing of Guns." Ordinance of the Director General and Council of New Netherland to Prevent Firing of Guns, 1665 N.Y. Laws 205. New York did not prohibit the <u>carrying</u> of weapons while consuming alcohol, but forbade the <u>firing</u> of guns on only two days out of the year——New Years and May Day——due to the "Drunkenness and insolence prevail[ing]" on those holidays. Even the <u>shooting</u> of firearms while under the influence of intoxicants remained lawful the other 363 days of the year, while the act of <u>carrying</u> guns was lawful every day.

¶109 Other laws closely predating ratification of the Second Amendment also indicate that early Americans regulated only the shooting or operation of guns but not the act of bearing them. In 1769, New York passed a law prohibiting "any person" from "fir[ing] and discharg[ing] any guns . . . in any street, lane, or alley, garden, or other inclosure, or from any house, or in any other place where persons frequently walk." An Act for the More Effectual Prevention of Fires in the City of New York, 1761-1775 N.Y. Laws 548 (1769). Likewise, in 1771 New Jersey passed a law prohibiting "any person . . . to set any loaded gun in such manner as that the same shall be intended to go off or discharge itself." An Act to Prevent Trespassing with Guns, 1763-1775 N.J. Laws 346, ch. 539, § 10. Neither of these

16

laws restricted the carrying of a firearm, regardless of a person's state of sobriety or level of intoxication.

¶110 Influencing colonial regulation of shooting——whether intoxicated or sober——was a concern for the wasteful expenditure of gunpowder and the potential for its unsafe storage. See Saul Cornell & Nathan DeNino, A Well-Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 510-11 (2004). Indeed, an array of 18th century statutes in the founding era "provide[d] for the safe storage and transport of gunpowder" and set "[l]imits on the amount of gunpowder a person could possess." Id. at 510 n.159, 511 (collecting statutes). Early 17th century laws also reflected this concern by proscribing the expenditure of gunpowder while drinking. In 1632, for example, Virginia passed a law prohibiting the "commander of any plantation" from "spend[ing] powder unnecessarily, that is to say in drinking or entertainment." 1632 Va. Acts 178, Acts of September 4th, 1632, Act XLIV (emphasis added). Laws criminalizing the carrying of a weapon while consuming alcohol are non-existent in the historical record predating and surrounding ratification of the Second Amendment.

¶111 The realities of life in early America explain why individuals under the influence of an intoxicant were able to carry arms with no legal impediment. "In early America, drinking alcohol was an accepted part of everyday life at a time when water was suspect[.]" Bruce I. Bustard, Alcohol's Evolving Role in U.S. History, Spirited Republic, Winter 2014, at 15, 15.

17

"Farmers took cider, beer, or whiskey into their fields," and ale would often accompany supper for many early Americans. Id. From the late-18th century until the mid-19th century, annual alcohol consumption was on average much higher than present day. Id.; see Bradley J. Nicholson, Courts-Martial in the Legion Army: American Military in the Early Republic, 1792-1796, 144 Mil. L. Rev. 77, 93 n.69 ("Heavy alcohol consumption was common in early America.") (citation omitted). In 1790, the average early American consumed approximately 5.8 gallons of alcohol annually, a figure which rose to 7.1 gallons by 1830. Bustard, supra, at 15. Contrast this to contemporary times, during which the average American consumes only 2.3 gallons per year. Id.

¶112 Coinciding with early America's culture of alcohol consumption was the widespread ownership of arms. "Gun owning was so common in colonial America (especially in comparison with other commonly owned items) that any claim that 18th-century America did not have a 'gun culture' is implausible, just as one could not plausibly claim that early Americans did not have a culture of reading or wearing clothes." James Lindgren & Justin L. Heather Counting Guns in Early America, 43 Wm. & Mary L. Rev. 1777, 1840-41 (2002). Guns were held by many Americans and were often passed down from generation to generation. See id. 1800-01, 1811 ("Guns were common in 1774 estates, even in admittedly incomplete probate records."). Accordingly, while founding-era lawmakers may have limited an individual's ability to shoot guns while drinking, prohibiting the carrying of firearms while

18

drinking did not square with the prevalence of early-American alcohol consumption and the carrying of firearms.

¶113 The right to bear arms was not unlimited, even in the founding era. During that time period, legislatures "disqualified categories of people from the right to bear arms . . . when they judged that doing so was necessary to protect the public safety." Kanter v. Barr, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting). In particular, early Americans restricted the possession of firearms by individuals who were "dangerous to society," such as violent felons. See Roundtree, 395 Wis. 2d 94, ¶75 (Rebecca Grassl Bradley, J., dissenting). However, there is no evidence in the historical record indicating that individuals under the influence of intoxicants were understood to present a "danger" to society much less temporarily disqualified from using firearms. To the contrary, the common law restricted firearm possession by those who committed "very serious, very dangerous offenses such as murder, rape, arson, and robbery." Don B. Kates & Clayton E. Cramer, Second Amendment Limitations and Criminological Considerations, 60 Hastings L.J. 1339, 1362 (2009). Additionally, "colonial legislatures passed statutes disarming Native Americans and slaves, purportedly out of fear of their armed 'revolt' or other threats to 'public safety.'" Roundtree, 395 Wis. 2d 94, ¶89 (Rebecca Grassl Bradley, J., dissenting) (citing Kanter, 919 F.3d at 458 (Barrett, J., dissenting) (citing Joyce Lee Malcolm, To Keep and Bear Arms 122 (1994))). Reflecting English parliament's fear of Catholic "revolt,

19

massacre, and counter-revolution," American colonists also dispossessed Catholics of their firearms. Kanter, 919 F.3d at 457 (Barrett, J., dissenting). Individuals temporarily under the influence of an intoxicant simply did not fall under any categorical exclusions from firearm possession, even temporarily, as confirmed by the lack of any founding-era laws imposing such restrictions.[5]

¶114 Founding-era history supports the conclusion that the Second Amendment protects the individual right to bear arms, notwithstanding the concurrent consumption of alcohol, but resolving Christen's as-applied challenge rests on a more fundamental foundation of the Second Amendment: an individual's right to bear arms within the home.

### B. The Second Amendment provides heightened protections in the home.

¶115 The Second Amendment's protection of the individual right to bear arms is most heightened in the home——where the State alleged Christen violated Wis. Stat. § 941.20(1)(b). As recognized by the United States Supreme Court, "'the need for defense of self, family, and property is most acute' in the home." McDonald, 561 U.S. at 767 (quoting Heller, 554 U.S. at

---

[5] Heller's language stating that the opinion should not be read to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill" is of no relevance in assessing the constitutionality of laws criminalizing the intoxicated bearing of firearms. Heller, 554 U.S. at 626. Heller decided the constitutionality of a ban on handguns in the home and the Court unequivocally ruled that challenges to other restrictions on the Second Amendment right must be resolved based upon its text, history, and tradition.

628). For this reason, the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." <u>Heller</u>, 554 U.S. at 635.

¶116 Unlike the majority's conclusions in this case, the United States Supreme Court's holdings are grounded in constitutional history. In colonial times, many able-bodied men were "not simply <u>allowed</u> to keep their own arms, but affirmatively <u>required</u> to do so." Don B. Kates, Jr., <u>Handgun Prohibition and the Original Meaning of the Second Amendment</u>, 82 Mich. L. Rev. 204, 214-15 (1983). This duty was deeply rooted in the English tradition, under which individuals had "arms readily available in their homes, . . . prepared at all times to chase down felons in response to the hue and cry, or to assemble together . . . in case of foreign invasion." <u>Id.</u> at 215 (citing F. Maitland, <u>The Constitutional History of England</u> 276 (Fisher ed., 1961)). In keeping with this tradition, "the [early American] duty to keep arms applied to <u>every</u> household, not just to those containing persons subject to militia services." <u>Id.</u> In this manner, colonial settlers provided "for the defense of their homes from criminals and foreign enemies." <u>Id.</u> (citing <u>The Laws and Liberties of Massachusetts</u> 42 (M. Farrard ed., 1929, reprinted from the 1648 ed.)).

¶117 Many founding-era scholars, who either influenced the Framers or interpreted the Constitution shortly after its adoption, understood the importance of keeping firearms in the home. William Blackstone, for example, described the right to

21

keep and bear arms in the home as an "absolute right of individuals," explaining that "having arms for . . . defence" is a "natural right of resistance and self-preservation." William Blackstone, Commentaries on the Laws of England 144 (John Murray, ed., 1857). St. George Tucker, a prominent anti-federalist, described the right to bear arms as the "true palladium of liberty" and cautioned against gradual encroachments on this right as witnessed in England. St. George Tucker, Blackstone's Commentaries 143 (1803). Tucker feared the State's "specious pretext[s]" for disarmament where "not one man in five hundred can keep a gun in his house without being subject to a penalty." Id. Both Blackstone's and Tucker's conceptions of the Second Amendment were deeply rooted in the writings of Sir Edward Coke, who likewise influenced the Framers. Coke adamantly affirmed the existence of the right to possess arms for home defense. See 3 Sir Edward Coke, The Third Part of the Institutes of the Laws of England 161 (5th ed., 1671). "For a mans house is his castle," wrote Coke, and "for where shall a man be safe, if it be not in his house?" Id.

¶118 "At the time of the founding, as now, 'to bear' meant to 'carry'"——a term which some understood, among other things, to reflect "the natural right of defense 'of one's person or house.'" Heller, 554 U.S. at 584 (citing 2 Collected Works of James Wilson (K. Hall & M. Hall eds., 2007)). Similarly, "arms" were understood to mean "weapons of offence, or armour of defence"——a right which unsurprisingly would retain paramount significance in the home. Id. at 581 (citing Samuel Johnson, 1

22

Dictionary of the English Language (1773)). Given the original meaning of the "right to bear arms," the Heller Court naturally determined that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation," particularly in "defense of hearth and home."[6] Heller, 554 U.S. at 592, 635 (emphasis added).

C. Wisconsin Stat. § 941.20(1)(b) as applied to Christen's right to bear arms in case of confrontation in his home

¶119 The Second Amendment's protection of the individual right to bear arms in the home in case of confrontation renders Wis. Stat. § 941.20(1)(b) unconstitutional as applied to Christen. On the night in question, Christen consumed alcohol to a point of intoxication. He went armed in case of confrontation with his roommates or their guests. Importantly, all of this conduct occurred within the confines of his own home. The Second Amendment most assuredly protects "carrying a gun from the bedroom to the kitchen" in one's home, yet § 941.20(1)(b) criminally penalized Christen for exercising this fundamental right. Rogers, 140 S. Ct. at 1868 (Thomas, J.,

---

[6] This is not to say that the Second Amendment does not apply with full force outside the home. Far from it. "It would take serious linguistic gymnastics——and a repudiation of [the] Court's decisions in Heller——to claim that the phrase 'bear arms' does not extend the Second Amendment beyond the home." Rogers v. Grewal, ___ U.S. ___, 140 S. Ct. 1865, 1869 (2020) (denying petition for writ of certiorari) (Thomas, J., dissenting). Indeed, "the full context . . . [of Heller] shows that the Second Amendment" is not "confined to the 'defense of hearth and home.'" State v. Roundtree, 2021 WI 1, ¶92, 395 Wis. 2d 94, 952 N.W.2d 765 (Rebecca Grassl Bradley, J., dissenting).

23

dissenting) (quoted source omitted). The Second Amendment does not countenance such a restriction on the fundamental individual right to bear arms in case of confrontation in the home.

¶120 The fact that Christen was intoxicated does not justify the State's encroachment on this fundamental right. During the founding era, legislatures did not restrict the individual right to bear arms to periods of sobriety, even outside the home. Within the home, the right to bear arms is "most acute." McDonald, 561 U.S. at 767 (quoting Heller, 554 U.S. at 628).

¶121 While the majority acknowledges that "[a] lawful firearm owner, even if intoxicated, cannot be convicted under § 941.20(1)(b) if he or she acts in self-defense," majority op., ¶27 (emphasis added), the majority fails to understand the difference between acting in self-defense and going armed in case of confrontation. In Wisconsin, "[a] person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person." Wis. Stat. § 939.48(1). In this case, because a jury concluded that Christen did not act in self-defense, the majority leaps to the conclusion that he was properly convicted. See majority op., ¶46. But in rejecting Christen's self-defense argument, the jury concluded only that Christen was not privileged to threaten or use force against his roommates or their guests. In upholding Christen's conviction, the majority conflates carrying a gun with actions taken in

24

self-defense——the threat or intentional use of force. The majority never addresses Christen's argument that the Second Amendment guarantees the right to bear arms in the home in case of confrontation, whether intoxicated or sober. It does.

¶122 As the constitutional text and the historical record establish, criminalizing the intoxicated carrying of firearms in the home violates the original meaning of the Second Amendment, which "guarantee[s] the individual right to possess and carry weapons in case of confrontation." Heller, 554 U.S. at 592. This exercise of the right to bear arms retains heightened protections in the home, "where the need for defense of self, family, and property is most acute." Id. at 628. Because Wis. Stat. § 941.20(1)(b) criminalized the right to bear arms in case of confrontation in the home, the statute violated Christen's Second Amendment right to bear arms.

* * *

> A blind enforcement of every act of the legislature, might relieve the court from the trouble and responsibility of deciding on the consistency of the legislative acts with the constitution; but the court would not be thereby released from its obligations to obey the mandates of the constitution, and maintain the paramount authority of that instrument[.]

Philip B. Kurland & Ralph Lerner, The Founders' Constitution, Vol. V, p. 213 (1987) (quoting Bliss v. Commonwealth, 12 Little 90 (Ky. 1822)). The majority reflexively defers to the legislature's encroachment of fundamental constitutional rights, in derogation of the "paramount authority" of the Constitution. In doing so, the majority embraces the policy-laden notion that

25

the Second Amendment protects something the majority deems too dangerous and perhaps dislikes. The majority's disdain for the "pre-existing right" of "citizens to use arms in defense of hearth and home," Heller, 554 U.S. at 635, is evident in its unconstitutional recasting of this fundamental right as a mere "privilege" bestowed by the State, as the majority sees it. See majority op., ¶44. This case represents the latest example of judges "decid[ing] on a case-by-case basis whether the right is really worth insisting upon." Heller, 554 U.S. at 634. As the United States Supreme Court recognized in Heller, that decision was made by the American people at the time the Second Amendment was adopted. In this decision, the majority overrides the will of the people by circumscribing the fundamental constitutional right to bear arms in case of confrontation in the home. I respectfully dissent.